Judge Owsley
delivered the opinion.
This was an action brought by David, a boy of color, against Talbot, for the purpose of recovering his freedom.
Talbot, in his plea, justified, by alledging the boy to be a slave; and issue being thereto joined, a jury was called. On the trial, Talbot introduced evidence proving that David was of African descent, and held by him in bondage.
The counsel for David then produced from a book, called by the clerk of the Scott county court an order book, the following transcript, to wit:—"February court, 1810: "On motion of Jesse Griffith, ordered, that Jack, aged 29 "years, Jane, aged 25 years, and George, aged 21 years, his "slaves, be manumitted and set free, agreeable to a deed "which said Griffith has filed;" and proved by one witness, (Isaac Griffith,) that he came with his brother, Jesse Griffith, to Scott court on the day the order was made, and caused a similar order to be made in relation to one of his slaves: that he was present when the order was made; conversed with his brother on the subject, and heard nothing said about a deed, and did not know one was necessary, and executed none himself, and did not think one was executed by his brother. Another witness proved he was a justice of the peace, and was present at court, but not on the bench, when the order was made, and that he recollected nothing of a deed being executed, and knew the court had formerly not considered a deed of emancipation necessary, and had made similar orders without deeds—he having himself obtained an order emancipating a slave without a deed. An other witness proved that he was present when the Griffiths obtained the orders of emancipation, but recollected nothing of any deeds; that Talbot had traded with the father and mother of David as free persons; and was informed by Talbot, the manner he obtained the custody of David in 1818, and brought him from the state of Ohio, to which place he had fled for refuge; and that Talbot claimed him in right of his wife, who was on of the heirs of_______ Houston, dec. to whom his mother had belonged; and that the woman named Jane in the order book, was the mother of David, who was born since 1810: that Jane and her husband continued to reside, enjoying their freedom, in the neighborhood of Talbot's ever since 1810, until the sum *604 mer 1819; that Talbot married about ten or twelve years ago, and likewise resided in the neighborhood.
It was also proved, that the grandmother of David was the property of Houston at the time of Jane’s birth, in the state of Delaware, and Jane was held by him as a slave about 30 years ago; that Houston, about that period, died in that state, and Mrs. Talbot, one of his children, and two others of his children, and Jane, the mother of David, lived with the widow Houston until her marriage with Griffith, about 25 years ago: that after their marriage they lived with Griffith and removed with him from Delaware to Kentucky in 1800, being then infants: that Mrs. Talbot continued to reside with Griffith until her marriage with Talbot, and the other children still longer. The order in the the same book, relative to the slave of Isaac Griffith, was also read by Talbot’s counsel in the following words, to wit: “February court, 1810—Isaac Griffith came into court, “and agreeably to an act of assembly in such case provided, and with the assent of the court, by deed manumits and “sets free his slave Noah, aged 25 years.” The clerk of the court was then introduced, and produced a book, which he called a minute book of that court, containing orders in the following words, to wit: “February court, 1810—On “motion of Jesse Griffith, ordered, that Jack, aged 29, Jane, “aged 25, George 21, are manumitted. Isaac Griffith “manumits in like manner his slave Noah, aged 25.” And being examined, the clerk proved that, he was not clerk of the court at the date of those orders, but had been clerk since the summer 1817: that the first book introduced had no signature or attestation by any member of the court; but the court was in the habit of referring to it for information, and gave credence to it in court as the true record: that he knew of no written order, or rule of court, authorising the clerk to make suck a book; but ever since he became clerk, it had been his practice to keep up the entries in that book, and the court had allowed his charge by the purchase of one: that the book, called the minute book, contained the proceedings of the court as entered by the clerk in the form of minutes in the presence of the court when sitting, and was regularly signed by the presiding magistrate at each adjournment: that he had examined the office and could find no deeds of emancipation for the year 1810, and none could be found in his office emancipating either David or his mother Jane.
Inferences of facts from given principles are properly within the province of the jury, not of the court.
Upon this evidence, and on the motion of the counsel of David, the court instructed the jury, that they were bound from the records to presume a deed of emancipation from Jesse Griffith to the mother of David, duly executed; and that, as the statute of Delaware regulating the course of descents was not shewn, the possession of the blacks by Griffith would justify a presumption that he had the right to make such a deed. To these instructions Talbot excepted, and spread the whole of the evidence upon the record.—Under these instructions the jury found a verdict for David, and the court rendered judgment accordingly. From that judgment Talbot has appealed.
The assignment of errors questions the decision of the court contained in the instructions to the jury.
In the consideration of these instructions, two questions arise—1st, Whether, from the evidence contained in those orders read in evidence, the jury was bound to presume a deed was regularly executed by Jesse Griffith emancipating Jane, the mother of David? and 2d, Whether, as the laws of descents of the, state of Delaware were not produced, the possession of Jane would justify the presumption, that he had the right to emancipate her?
The first question seems properly to divide itself into two enquiries—1st, as to the legal effect of the order contained in what was called by the witness an order book, and which was given in evidence by David: and 2d, the legal effect of the order contained in what was called the minute book, and which was given in evidence by Talbot We say the legal effect of those orders; for the instructions of the court cannot be sustained, unless it be upon the supposition of the orders, by operation of law, importing the due execution of a deed of emancipation by Griffith. If, by implication of law, those orders do not import the due execution of such a deed, but contain evidence from which the jury might presume a deed to have been regularly executed, the presumption is, properly, a presumption of fact, which it was incumbent upon the jury, and not the court, to make, and which the court, as matter of law, ought not to have instructed them they were bound to make—not only because, by so instructing the jury, the court presumed a fact which belonged to the province of the jury to presume, but because, moreover, the court thereby withdrew from the jury the decision of other facts which were proven for the purpose of repelling that presumption; for if the *606 presumption be not implied by law, it might, no doubt, be repelled by other evidence, which, as well as that of the presumption, it was the right of the jury, and not the court, to weigh and determine.
The minutes of the orders of county courts, subscribed by the presiding magistrate, is the only legal record of their proceedings:—the subsequent extension of those minutes by the clerk in another book is no evidence.
But as to the legal effect of the orders—and first, as to that given in evidence:
That order, we are of opinion, cannot be admitted to contain any thing from which the jury was conclusively bound to presume a deed of emancipation was given by Griffith If, under any circumstances, it could be entitled to that operation, the order must assume, in the scale of evidence, the elevated grade of record evidence; but we know of no principle upon which it can be so considered. It appears not to have been made under the superintendance of the court, or any member thereof, but was drawn up by the clerk, in vacation, in a book containing no signature of any member of the court. The county court, it is true, is proven to be in the habit of referring to the book and giving credence to the orders therein contained; and the practice appears to have been without exception for the clerk of that court to draw up, in vacation, the entries made at each preceding term of the court; but there is no law authorising either the court to direct, or the clerk to make up, in vacation, the proceedings of the court, and, we apprehend, that no entry made without the authority of law can be entitled to the sanctity of a record. The statutes of this country contain nothing in relation, either to the general duties of the court, or clerk, in causing the proceedings of courts to be recorded; but there is a provision in the county court law of Virginia, in force at the separation of this state from that, which points out the duty of the court in causing entries of its proceedings to be made, and which, we apprehend, is still in force here. That law requires the minutes of the proceedings of each court, before its adjournment, to be signed by the eldest justice in commission then sitting, and expressly declares, that no order or judgment shall be of any effect until the minutes are so signed; but the law contains no authority for the clerk in vacation to draw up, in a separate book, those minutes more at large. In land cases, of which the county courts of Virginia then had, but of which they have not now, jurisdiction, the law required the pleadings, which were to be in writing, to be carefully preserved by the clerk, and entered at large by him in a book kept for that purpose; but *607 in no other description of case is the clerk entrusted with authority to draw up in a separate book the proceedings of the court. The order, therefore, must have been made by the clerk without lawful authority, and cannot be entitled to the appellation of a record. And to give to it the conclusive operation of a judicial record, would certainly be conceding to clerks greater authority than courts have been admitted to possess. For whilst the decision of courts made directly on a matter within their jurisdiction, has ever been held conclusive between the parties, their decision, in relation to a subject not cognizable before them, has never been held binding: not even the consent of parties, much less any practice which the courts may have indulged, can give to their decision, on a matter not within their jurisdiction, any legal effect;—Such a decision is extra judicial, and intrinsically void, and inadmissible either as a plea, as a bar, or as evidence. Let it not be said that the objection goes to the competency of the order as evidence, and as it was used in the court below without objection, its legal import was proper for the decision of the court. For conceding its competency as evidence to have been admitted in that court, it does not from thence follow, that it should be considered as a record, or that it was proper for the court to instruct the jury they were bound from it to presume the regular execution of a deed of emancipation. By failing to object to the order, Talbot may have intended to admit its competency to prove the clerk made such an order, but not to admit, that, when made, the order was conclusive evidence of the facts therein stated. In legal strictness, upon the supposition of the order being made without authority, it cannot be entitled to greater weight than the evidence of the clerk who made it, if he had been introduced; and it is presumed that none will contend, if the facts contained in the order had been proven by the clerk only, it would have been regular for the court to give the instructions which were given to the jury.
The decisions of courts as to matters of which they have jurisdiction, are conclusive between parties thereto; out as to matters coram non judice, they are not entitled to any weight.
Altho' the order book, made out by the clerk in vacation,may have passed sub silento, it does not thereby become valid evidence, it is only an admission that the clerk made such an order.
Having disposed of the order first given in evidence, we shall proceed to the second enquiry, namely, as to the effect of the order given in evidence by Talbot. That order, it will be recollected, is contained in a book, called by the clerk the minute book, and purports to have been regularly signed by one of the justices composing the court when the order was made. The order, therefore, must be admitted to possess all the force and effect of one regularly made by *608 the clerk under the directions, and in the presence of the court, and contains intrinsic evidence of the court having on the motion of Griffith, ordered the manumission of Jane, the mother of David. But in deciding on the legal import of that order, it is proper to advert to the law authorising slaves to be emancipated. By the 27th section of the act of February, 1798, (2 Litt. 119,) it is provided, "that it “shall be lawful for any person, by his or her last will and “testament, or by any other instrument in writing, under “his hand and seal, attested and proved in the county court, “by two witnesses, or acknowledged by the party in the “court of the county where he or she resides, to emancipate “or set free his or her slave or slaves, who shall thereupon “be entitled and fully discharged from the performance of “any contract entered into during his servitude, and enjoy “their full freedom as if they had been born free. And the “said court shall have full power to demand bond and sufficient security of the emancipator, his or her executors or “administrators, as the case may be, for the maintainance “of any slave or slaves, that may be aged or infirm either “in body or mind, to prevent him of them from becoming “chargeable to the county; and every slave so emancipated; “shall have a certificate of his freedom from the clerk of “such court on parchment, with the county seal affixed “thereto."
In emancipating slaves it must be done by will or deed—the court have nothing to do with it but to receive probate, and require bond if necessary to protect the county: the person is free by the execution & proof of the deed or will, without any agency of the county court; and if the emancipated becomes chargable to the county, the emancipator is liable by suit.
That, to effect the emancipation of slaves, the requisitions of this act must be complied with, there can be no question; but we are of opinion the act cannot, upon any rational principle of interpretation, be construed to require of the court an order of manumission to effect the liberation of a slave. The owner is the only person capable of releasing his slave from bondage, and the law has prescribed the mode by which it may be done; but the only act for the court to perform, is, to receive proof of the execution of the will, or deed, by which the manumission may be effected. To give to the act of the court, in taking the proof, any judicial effect, it is true, under the law of Virginia, already cited, it is essential that an entry should be made in court, and signed by one of the justices before the adjournment; but, immediately upon that being done, and without any order of manumission, the slave becomes ipso facto free, and released from all obligations of servitude. The court may, under the law, require of the emancipator bond and security, but that is a discretionary power vested in the *609 court, to prevent aged and inform negroes from becoming chargeable to the county, and cannot be construed to require of the court an order of manumission before the slave is entitled to his freedom. An order requiring such bond and security would, no doubt, be obligatory on the emancipator; but whether or not complied with, cannot affect the right of the slave to his freedom. If not complied with, the remedy is against the emancipator or his representatives, and can alone be enforced in a proceeding against them, and not against the person emancipated.
The judgment of a court on a collateral point is not conclusive, tho' within its jurisdiction
In the absence of all proof, a jury may rightfully infer that the possession of a slave is evidence of title.
The laws of a sister state cannot be judicially noticed by our courts, but must be proved, as every other fact by competent evidence.
If, then, we a recorrect in supposing the court is not required by law to make an order of manumission, it results, that the order in question cannot have the operation supposed by the court below in its instructions to the jury.
There is a propriety in the law, presuming that to have been correctly done which is done by a court of competent jurisdiction; but it would be strange to suppose, that from the decision a fact not within the jurisdiction of the court, the law, would imply the existence of any collateral fact. Although the judgment of a court of exclusive jurisdiction, directly upon the point, is admitted to be conclusive between the parties upon the same matter, coming incidentally in question in another court for the same purpose, it is said, that neither the judgment of a court of concurrent or exclusive jurisdiction, is evidence of any matter which came collatterally in question, though within their jurisdiction, nor of any matter to be inferred by argument from the judgment. Phil. Ev. 242; 1 Salk. 280—a fortiori, cannot the order under consideration imply, that Griffith, the owner of the slave, executed a deed of manumission? for the order was made not only without the authority of law, but it contains no suggestion from which the execution of a deed of manumission can, by any fair inference, be presumed.
It follows, therefore, that the court erred in its decision to the jury as to the legal import of the orders given in evidence.
As to the other branch of the instructions, it may be remarked, that the possession of a slave may, in the absence of other circumstances, be sufficient to justify the jury in presuming the right to be with the possession; and that to shew he was entitled to the slave in right of his wife as heir to Houston, Talbot ought to have produced evidence of the laws regulating the course of descents in the state of Delaware; *610 for as Houston, at the time of his death, resided in the state of Delaware, the laws of that state must control the descent of his slaves to his heirs, and the courts of this country cannot take judicial notice of those laws, but as other facts they must be proven by competent evidence.
Haggin for appellant, Crittenden and Bibb for appellee.
The judgment must be reversed, and the cause remanded, and further proceedings had, not inconsistent with this opinion.